UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

BARRY BOLES,

        Plaintiff

                    v.

WAL-MART STORES, INC.,

        Defendant

CIVIL ACTION NO. 2:12-cv 1762

Document Electronically Filed

---

**PLAINTIFF'S COUNTER-STATEMENT OF
UNDISPUTED MATERIAL FACTS
AND SPECIFIC RESPONSES TO DEFENDANT'S
STATEMENT OF UNDISPUTED MATERIAL FACTS**

---

Colin M. Page & Associates
Attorneys for the Plaintiff
Barry Boles
333 Route 46 West, 2nd Floor
Mountain Lakes, NJ 07046
T: 973-794-6188  | F: 973-909-7553
colin@page-employment-law.com

## PLAINTIFF'S COUNTER-STATEMENT OF UNDISPUTED MATERIAL FACTS

### BARRY BOLES' DISTINGUISHED CAREER WITH WAL-MART

1. Barry Boles' highest level of education is a High School diploma and two years of community college. (Boles Dep. 10:22-11:10).

2. At the time of his termination, Boles was married and had two daughters. He was the primary breadwinner for his family. (Boles Cert. ¶1).

3. Boles worked for Wal-Mart for approximately twelve (12) years. (Boles Dep. 21:21-22:6).

4. During his career with Wal-Mart Boles received awards and numerous promotions. (Boles Dep. 19:11-15, 21:18-20).

5. Boles began working for Wal-Mart as a backroom Associate in in Linden, New Jersey. (Boles Dep. 19:22-21:24).

6. Boles worked in pharmacy, then moved to garden, and was ultimately promoted to Department Manager for Hardware. (Boles Dep. 19:7-10).

7. While in Linden, Boles received an award for being Best Associate in the Store and was awarded a chance to attend annual meetings in Arkansas for three (3) years. (Boles Dep. 19:11-15).

8. After approximately two years in the Linden store, Boles transferred to Quincy Florida, where he was promoted to

Support Manager, Grocery Manager and Meat Manager (Boles Dep. 20:1-10).

9. In 2010, Boles transferred back to Linden, New Jersey and began training to become an Assistant Manager. (Boles Dep. 21:1-9)

10. In late 2010, Boles was promoted to Assistant Manager (overnight) and transferred to Union, New Jersey. (Boles Dep. 31:3-15).

**BOLES' SERIOUS HEALTH CONDITION AND REQUESTS FOR LEAVE**

11. On or about May 8, 2011, Boles was sleeping after having worked his night shift and his wife noticed a large blister on his lower leg. (Boles Dep. 40:4-41:16).

12. Boles went to the emergency room to obtain treatment. (Boles Dep. 40:10-17).

13. The emergency room physician advised Boles that he did not know what the cause was and advised him to seek further treatment from his own doctor. (Boles Dep. 40:10-17, 43:12-24)

14. The emergency room doctor gave Boles a note excusing him from work. (McDonald Dep. Ex. E)

15. Boles saw Dr. Gail Mautner, a Board-Certified Dermatologist on May 9, 2011. (Boles Dep. 44:1-2; Mautner Dep.   , Ex. 2, p. 2)

16.  Boles presented to Dr. Mautner with a large blister on his lower leg which she punctured, resulting in a large ulceration (open wound).  (Mauter Dep. 136:15-24, Ex. 2, p. 2)

17.  Dr. Mautner characterized the wound as large and testified that she considered Boles' condition to be dangerous because wounds on the lower leg are known for poor healing due to lack of circulation and such wounds are vulnerable to infection and necrosis.  (Mautner Dep. 137:3-138:18).

18.  Dr. Mautner provided Boles a note excusing him from work until May 21, 2011.  (McDonald Dep. Ex. E)

19.  On May 10, 2011, Boles' wife faxed Wal-Mart the note from the emergency room physician and Dr. Mautner.  (McDonald Dep. Ex. E).

20.  According to Wal-Mart policy, requests for medical leave are supposed to be passed on to Wal-Mart's corporate leave administration group or Human Resources Support Services ("HRSS") group. (Brown Dep. 6:7-15, 7:7-11, 12:12-14:6).

21.  Within five days of receiving either a written or verbal notification of a request for leave, the HRSS group is supposed to send the Wal-Mart Associate a notification of FMLA leave rights. (Brown Dep. 12:12-24).

22.  Wal-Mart's Corporate Representative testified that the doctors' notes Boles initially submitted should have been sent by the store or market human resources office to the corporate

leave administration group (HRSS).  (Brown Dep. 12:15 -14:6, 19:6-16).

23.  Had Boles' doctors notes been submitted to HRSS they should have triggered the sending of an FMLA Notice of Eligibility. (Brown Dep. 27:12-17).

24.  No one from the market Human Resources office or the store contacted Wal-Mart's corporate leave administration group when Boles first requested leave.   (Brown Dep. 27:12-21, McDonald Dep. Ex. M).

25.  The required notification of FMLA leave rights was not sent to Boles in response to the doctors' notes that he submitted on May 10, 2011. (McDonald Dep. Ex. M, N)

26.  On May 12, 2011, Wal-Mart's sent Boles FMLA Leave of Absence request documents. (McDonald Dep. Ex. F)

27.  Wal-Mart's FMLA packet states that forms are to be submitted to the Associate's "Human Resources representative." (McDonald Dep. Ex. C).

28.  Boles understood that his Human Resources representative was the Market Human Resources Manager, Quawad McDonald and that communications regarding his leave were to go through the market office. (Boles Dep. 52:5-53:2, 123:15-21).

29.  On May 20, 2011 Boles saw Dr. Mautner again. (Mautner Dep. Ex. 2, p. 4).

30.  Dr. Mautner's treatment notes indicate that she diagnosed Boles with a 10cm erosion/ulcer (open wound) and recommended the treatment of "continue dressing changes till healed, leg elevation, observation and dressing changes with topical abx. Rec. that pt not go to work due to physical activity worsening leg edema and ulcereation."  (Mautner Dep. Ex. 2, p. 4).

31.  Dr. Mautner filled out Wal-Mart's  "Certification of Health Care Provider for Associate's Serious Health Condition" form and her office faxed the form to Wal-Mart's market Human Resources office.  (McDonald Dep. Ex. H).

32.  On the form, Dr. Mautner indicated that Boles was suffering from a "large, painful ulceration in lower extremities." She indicated Boles was unable to work and should be out of work until "medically discharge from [her] care" and she estimated that Boles would be out for at least a month.  (McDonald Dep. Ex. H).

33.  Again, no one from the market Human Resources office sent the Boles' leave request and medical paperwork to Wal-Mart's corporate leave administration group and the required FMLA notifications were not sent. (McDonald Dep. Ex. M).

34.  Wal-Mart policy provides paid medical leave to eligible salaried members of management. (Brown Dep. 7:12-22).

35.  The secretary in the market office, Stephanie Gonzalez, told Boles that if he submitted his medical paperwork,

McDonald would approve his request for leave. (Boles Dep. 227:8-16).

36. Wal-Mart continued to pay Boles' salary and although he received no official notification that his leave had been approved, he continued to be paid and he believed that his leave was authorized. (Boles Dep. 59:11-13, 227:12-228:2, McDonald Dep. Ex. Q).

37. Boles met with Dr. Mautner again on June 16, July 7 and July 19 and due to the fact that his wound was healing very slowly, she continued to recommend that he keep his leg elevated and not return to work. (Mautner Dep. Ex. 2, pp. 6-8).

38. On July 13, 2011, Quawad McDonald, the market Human Resources Manager contacted HRSS. He claimed that Boles was on unauthorized leave and had not submitted his leave of absence paperwork. (McDonald Dep. Ex. M).

39. Shonda Brown, Wal-Mart's leave administration manager, advised that McDonald send in the paperwork that he had and submit a leave form so that "we can send out FMLA notices in order to be compliant." (McDonald Dep. Ex. M.)

40. McDonald filled out a leave request form for Boles. At the time, McDonald knew that the leave was purportedly for a medical issue. However, instead of filling out a FMLA leave request, he filled out a personal leave request and instead of

checking the box that indicated the request was for Boles'
"own serious health condition," he checked the box for
"other." (McDonald Dep. Ex. I).

41. McDonald copied Mike Ciechalski, Boles' store manager on
his e-mails to and from HRSS. (McDonald Dep. Ex. P).

42. Ciechalski responded: "Can I ask why we are not terminating
at this time?" (McDonald Dep. Ex. P).

43. McDonald replied: "Terminating Barry would be a violation
of company policy.  I sent you this e-mail to keep you in the
loop with the process."  (McDonald Dep. Ex. P).

44. Notably, although Ciechalski had previously raised some
with Boles performance as an Assistant Manager to McDonald, at
no point prior to Boles' leave had he asked for Boles to be
terminated.  (Weisbrot Cert. Ex. I).

45. In mid-July, Boles' pay was suspended. (McDonald Dep. Ex.
L).

46. Prior to the suspension of Boles pay, no one at Wal-Mart
sent any kind of written notification to Boles regarding his
leave being disapproved, any failure to submit paperwork or
any other written warning of any kind.  (Boles Cert. ¶2)

47. On July 15, 2011 Brown e-mailed Boles' FMLA Notice of
Eligibility and Designation forms to the Market Area human
resources manager McDonald.  (McDonald Dep. Ex. L)

48. The form indicated that Boles was eligible for FMLA leave and that he had until July 30, 2011 to submit appropriate paperwork. (McDonald Dep. Ex. N)

49. Boles never received the Notice of Designation form from McDonald or anyone else at Wal-Mart. (Boles Cert. ¶3).

50. When his pay was suspended, Boles reached out to the market human resources office which sent him leave paperwork that he again had his doctor fill out. (Quawad Dep. Ex. L).

51. On July 26, 2011 Dr. Mautner filled out another "Certification of Health Care Provider for Associate's Serious Health Condition" form. (McDonald Dep. Ex. K).

52. Because Boles' wound was healing very slowly, Dr. Mautner indicated that Boles suffered from "leg ulcers" and identified his symptoms as "pain,swelling, oozing." She estimated that the condition was likely to last for six (6) months and that Boles could return to work in "October/November 2011." (McDonald Dep. Ex. K).

53. Along with Mautner's certification, Boles submitted a Leave Request form but did not fill out the return date. (Boles Dep. 114:8-11).

54. On July 28, 2011, Market Human Resources Manager acknowledged receipt of the appropriate paperwork and Boles' request for leave in an e-mail to leave administrator Shonda Brown. He stated:

> After switching Barry to unpaid status . . . he
> finally reached out to us. I faxed him a new set of
> LOA paperwork, this time he filled them out correctly.
> **The paperwork said he needed to be out until November
> 2011.** (McDonald Dep. Ex. L).

55. Wal-Mart's corporate representative confirmed that Wal-mart
understood that Boles was requesting leave through November
2011. Shondra Brown testified:

> Q. Okay. Why was – the request for leave was through
> November, correct?
>
> A. Correct.
>
> Q. You did not grant or Wal-Mart did not grant the
> request for leave through November; is that fair?
>
> A. Correct. (Brown Dep. 39:9-15).

56. On or about August 11, 2011 Wal-Mart's corporate leave
administration group approved leave through September 29,
2011. (McDonald Dep. Ex. M).

57. Wal-Mart approved FMLA leave from May 9, 2011 through July
31, 2011 and approved Personal Leave from August 1, 2011
through September 29, 2011. (McDonald Dep. Ex. M, O).

58. No one from Wal-Mart's HRSS group attempted to contact
Boles or Dr. Mautner to discuss Boles' need for leave through
November 2011. When asked if anyone attempted to contact
Boles or his doctor to discuss his need for leave beyond
September 29, 2011, Wal-Mart's Corporate Representative,
testified:

That's not in our normal practice.  Just to give you
an explanation, we support the entire Realty Division
and the entire Field Management, so think how many
stores we have in the US.  **It would be impossible to
call every associate that applied, this is why you
didn't get additional time.**  That's why the
designation is provided.  (Brown Dep.  45:24-46:10).

59. According to Wal-Mart files, a "Notice of Designation
(FMLA)" form was generated on August 18, 2011.

60. Boles does not receive the Notice of Designation form, or
any other notice regarding his leave from Wal-Mart. (Boles
Cert. ¶4).

61. Wal-Mart's Corporate Representative testified on April 17,
2013 that it is currently Wal-Mart's practice to track the
sending and receipt of FMLA notifications via certified mail
but she could not recall when the practice of tracking the
notices started and whether notices were tracked at the time
of Boles' request for leave.  (Brown Dep. 17:22-18:12).

62. The Notice of Designation (FMLA) form that Wal-Mart
allegedly sent to Boles stated that his FMLA leave was
approved and that **"All leave taken for this reason will be
designated as FMLA leave."**  (Quawad Dep. Ex. O)(emphasis
added).

63. The Notice of Designation also indicated that Wal-Mart was
unable to determine how much time would be counted against
Boles' FMLA entitlement.  The box that was checked stated:

> Because the leave you will need will be unscheduled, it is not possible to provide the hours, days or weeks that will be counted against your FMLA entitlement at this time.   You have the right to request this information once in a 30 day period (if leave was taken in the 30-day period). (Quawad Dep. Ex. O).

64. The form also stated that Boles needed to obtain clearance from his doctor before he could return to work.

> You will be required to present a written release from your health care provider prior to returning to work, describing any restrictions you may have.  If such release is not timely received, your return to work may be delayed until a release is provided. (Quawad Dep. Ex. O).

65. The form lists an "Anticipated Return to Work Date of September 30, 2011. (Quawad Dep. Ex. O).

66. At the very bottom of the form, a box was checked indicating that Boles' FMLA leave was exhausted. (Quawad Dep. Ex. O).

67. Nowhere on the Notice of Designation Form is there any warning whatsoever that Boles' employment could be terminated if he failed to return to work by September 30, 2011. (Quawad Dep. Ex. O).

68. Boles was not aware that there was any requirement that he return to work by September 30, 2011.   (Boles Dep. 229:24-230:23).

**Boles' Communications With Wal-Mart In September and October and His Attempt to Return to Work**

69. While Boles was on leave, he communicated with the market human resources office by leaving messages and he periodically sent text messages to McDonald. (McDonald Dep. 173:14-18, 176:11-22)

70. McDonald acknowledged at his deposition that he never called Boles regarding his leave. (McDonald Dep. 172:14-25).

71. McDonald claimed HRSS called Boles, however Wal-mart's HRSS representative testified that HRSS did not call Boles because it did not have the resources to contact all employees that requested leave. (Brown Dep. 45:24-46:10).

72. During discovery, Wal-Mart was asked to identify any and all attempts it made to communicate with Boles regarding his return to work. Wal-Mart did not indicate that it made any attempts to communicate with Boles in September or October 2011. Wal-Mart stated:

> Some, but not all, of those attempts to contact Plaintiff occurred on May 8, 2011, May 12, 2011, May 18, 2011, June 14, 2011, June 15, 2011, June 22, 2011, June 23, 2011, June 24, 2011, July 1, 2011, July 2, 2011 and July 5, 2011. (McDonald Dep. Ex. 2, p. 5).

73. At his deposition, McDonald acknowledged that he received text messages from Boles. (McDonald Dep. 173:14-18, 176:11-22)

74.  Boles saw Dr. Mautner on September 16, 2011 and her notes
     indicate that ulceration was healing and "doing well."  She
     recommended continued "leg elevation and warm soaks." (Mautner
     Dep. Ex. 2).

75.  Boles sent McDonald a text message at some point following
     this appointment:

> Hi Q THIS IS Barry iv been calling the market office
> for 2, weeks and I do not get answer my doctor have
> not yet release me to go back to work she said I must
> see her on the 12, of October and if I look good  than
> I will be back to work the following week, but I have
> try to call you as well and you did not call me back
> and also my wife tried to call the market office as
> well so I ha e tried to keep you informed but no ne
> has tried to get back to me so if you need anything
> just call me. (McDonald Dep. Ex. T)

76.  On October 3, 2011 Boles' father died and Boles sent
     McDonald another text message:

> Good morning Q this is Barry I had my dad pass away
> this morning and I will be going away to buried him
> and Im taking it hard but I will keep you posted on my
> return I still has my doctor appointment on the 12th
> October. (McDonald Dep. Ex. T)

77.  McDonald conceded at his deposition that he had received
     Boles' text notifying him that his father had died, but
     claimed that the text he received did not say anything about
     Boles' need for leave beyond September 30, 2011.  (McDonald
     Dep. 176:3-178:20)

78.  Boles ultimately met with Dr. Mautner on October 17, 2011.
     (Mautner Dep. Ex. 2, p. 12).

79. Boles met with Dr. Mautner and she found that his wound had finally closed and she advised that he could return to work in a week. Her notes stated: "ok to return to work cautiously in 1 wk" (Mautner Dep. Ex. 2, p. 12).

80. Dr. Mautner gave Boles a note clearing him to return to work on October 24, 2011. (Mautner Dep. Ex. 7).

81. Boles called the market office and notified Wal-Mart that he would be returning to work on October 24, 2011. (Boles Cert. ¶5).

82. Boles did not receive any response back from the market office or the store. (Boles Cert. ¶6).

83. On October 24, 2011 Boles reported to the store and attempted to begin his regular shift. (Boles Dep. 231:16-18).

84. At the time Boles attempted to return, his position at the Union store was vacant and had not been filled. (McDonald Dep. 163:11-164:19, Ex. R).

85. Prior to his attempt return to work, there had been no interruption in his pay and he received his normal salary of $1939.04 on September 29th, October 13th and October 27th, 2011. (McDonald Dep. Ex. Q).

86. When he returned to work, Boles attempted to log into Wal-Mart computer system but he could not get in. (Boles Dep. 231:22-232:8).

87.  Boles spoke to Ciechalski, the store manager and asked why he was not in the system.  Ciechalski told him that Quawad McDonald would have to put him back in the system and that until he did so, Boles could not work and should go home.  (Boles Dep. 232:9-13).

88.  Boles returned home and began calling the market office to try to obtain clarification on his return to work.  (Boles Cert. ¶7).

89.  No one returned his calls.  (Boles Cert. ¶8).

90.  On or about the 28th or 29th of October, Boles received a letter from Wal-Mart dated October 27, 2011 notifying him that his employment had been terminated effective October 25, 2011.  The letter stated:

> This is notification of your termination from the company effective Tuesday, October 25, 2011 for failure to return from LOA before expiration.  LOA time requested was extended on multiple occasions due to your unique circumstances.  Walmart understands when family and medical issues necessitate time away from work, however, you are responsible to meet eligibility requirements each time you take FMLA leave regarding submission of medical paperwork.  This action was considered as per the administration of rules and regulations governing Walmart's FMLA policy.  (Weisbrot Cert., Ex. W)

91.  Prior to his termination, no one at Wal-Mart had warned Boles in writing or verbally that he had to return by a specific date or his employment would be terminated.  (Boles. Dep. 229:1-230:23).

92. After he received notification of his termination, Boles tried numerous times to call the market office and the store (Boles Dep. 124:15-125:8).

93. Neither Store Manager Ciechalski nor Market Human Resources Manager McDonald called Boles back. (Boles Dep. 124:15-125:8).

94. Jose Miranda, the Shift Manager, called Boles back but he said that he was only doing what store manager Mike Ciechalski told him to do. (Boles Dep. 124:21-24).

95. When Boles attempted to return from leave, no one from the market or the store contacted HRSS to discuss how to handle Boles' attempt to return from his leave. (Brown Dep. 49:22-50:14).

96. During discovery, Plaintiff asked Wal-Mart in interrogatory no. 12 to "[s]tate the reason that Defendant terminated Plaintiff's employment." Wal-Mart's only answer was "job abandonment." (McDonald Dep. Ex. 2).

97. Boles contacted counsel and made a complaint of discrimination and interference with his FMLA rights to Wal-Mart on January 9, 2012. (McDonald Dep. Ex. A).

98. Boles subsequently applied for unemployment and Wal-Mart contested his claim for unemployment on the basis that he had left the job voluntarily without good cause. (Boles Cert. ¶9).

99.  The unemployment deputy initially found Boles disqualified for benefits. (Boles Cert. ¶10).

100. Boles appealed to the Unemployment Appeal Tribunal. (Boles Cert. ¶11).

101. The Appeal Tribunal held hearing on May 12, 2013 and at the request of Wal-Mart again on June 13, 2011. (Boles Cert. ¶12).

102. At the Appeal Tribunal hearing, Wal-Mart was represented by the same counsel that was representing Wal-Mart in this action. (Boles Cert. ¶13).

103. Wal-Mart presented witnesses at the Appeal Tribunal hearing. (Boles Cert. ¶14).

104.  The Unemployment Appeal Tribunal issued a decision on June 14, 2012 finding that Boles did not voluntarily leave his employment and that he was not discharged for misconduct. (Boles Cert. ¶15).

**Boles Would Have Explored Light Duty Work if He Knew That His Job Was at Risk**

105. Boles was never informed that my leave was not protected and he never understood that he could lose his job if he did not return by a certain date. (Boles Cert. ¶16).

106. Boles enjoyed his job at Wal-Mart and was proud of his career and he needed his job to support his family.  (Boles Cert. ¶17).

107. Had he known that his job was not protected, Boles would have explored his ability to return to work light duty. (Boles Cert. ¶18).

108. Boles would have done whatever was necessary to retain his job even if it meant returning to full duty and risking further injury. (Boles Cert. ¶19).

## Plaintiff's Specific Responses to Defendant's

## Statement of Undisputed Material Facts

1. No dispute.

2. No dispute.

3. No dispute.

4. No dispute.

5. No dispute.

6. No dispute.

7. No dispute.

8. No dispute.

9. No dispute.

10.  No dispute.

11.  No dispute.

12.  No dispute.

13.  No dispute.

14.  Disputed.  Boles testified at his deposition that the statements contained in this document were not true.  (Boles Dep. 66:16-67:9). The document that Defendant cites in support of its factual claim has not been authenticated by any witness. Moreover, the document is hearsay and is not credible evidence that the court may rely upon.

15.  Disputed.  Boles testified at his deposition that the statements contained in this document were not true.  (Boles Dep. 66:16-67:9). The document that Defendant cites in support

of its factual claim has not been authenticated by any witness. Moreover, the document is hearsay and is not credible evidence that the court may rely upon.

16.  Disputed.  Boles testified at his deposition that the statements contained in this document were not true.  (Boles Dep. 66:16-67:9). The document that Defendant cites in support of its factual claim has not been authenticated by any witness. Moreover, the document is hearsay and is not credible evidence that the court may rely upon.

17.  Disputed.  Boles testified at his deposition that the statements contained in this document were not true.  (Boles Dep. 66:16-67:9). The document that Defendant cites in support of its factual claim has not been authenticated by any witness. Moreover, the document is hearsay and is not credible evidence that the court may rely upon.

18.  Disputed.  Boles testified at his deposition that the statements contained in this document were not true.  (Boles Dep. 66:16-67:9). The document that Defendant cites in support of its factual claim has not been authenticated by any witness. Moreover, the document is hearsay and is not credible evidence that the court may rely upon.

19.  Disputed.  Boles testified that the coaching that he was presented with was false and that it made him angry and he refused to sign it because it was false. (Boles Dep. 67:6-24).

20.   Disputed.  Boles testified that he never walked out of the
store. (Boles Dep. 71:12-16).  The document that Defendant
cites in support of its factual claim has not been
authenticated by any witness. Moreover, the document is
hearsay and is not credible evidence that the court may rely
upon.

21.   Disputed. Boles testified that the statements contained in
this document were not true.  (Boles Dep. 71:12-73:15).  The
document that Defendant cites in support of its factual claim
has not been authenticated by any witness. Moreover, the
document is hearsay and is not credible evidence that the
court may rely upon.

22.   Disputed. The document that Defendant cites in support of
its factual claim has not been authenticated by any witness.
Moreover, the document is hearsay and is not credible evidence
that the court may rely upon.

23.   Disputed. The document that Defendant cites in support of
its factual claim has not been authenticated by any witness.
Moreover, the document is hearsay and is not credible evidence
that the court may rely upon.

24.   Disputed. The document that Defendant cites in support of
its factual claim has not been authenticated by any witness.
Moreover, the document is hearsay and is not credible evidence
that the court may rely upon.

25.  No dispute.

26.  No dispute.

27.  Disputed.  Boles advised management of the reasons for his
     absence.  The doctors notes provided medical verification of
     the information that Boles had already provided to Wal-Mart.

28.  No dispute.

29.  Disputed.  Wal-Mart's policy only requires 30 days notice
     where the need for leave is foreseeable.  The policy states:
     "If your need for FMLA Leave is not foreseeable, you are
     required to give notice as soon as practicable, generally the
     same day or the following business day after learning that you
     need to take leave."  The policy requires medical
     certification in support of the need for leave.  The policy
     says nothing about requiring "periodic reports during FMLA
     leave regarding the employee's status and intent to return to
     work."  The policy contains the following statement:

> You may be required to submit a new Certification Form
> to confirm your continuing need for a FMLA Leave under
> the following circumstances:
> o Your leave expires and you request an extension;
> o Circumstances described in your original request
>   have changed significantly;
> o Something happens to cast doubt on the reason for
>   the absence or the continuing validity of the
>   certification; or
> o Every six months.

30.  No dispute.

31.  No dispute.

32. No dispute.

33. Disputed.  It is Wal-Mart policy to provide employees that request FMLA leave a Notice of Eligibility within five (5) days of the FMLA request.  There is no evidence or testimony that establishes that Walmart actually meets that five-day rule for all employees that apply for FMLA leave.  Moreover, Boles testified that he never received the Notice of Eligibility.  Moreover, no Notice of Eligibility was generated until July 15, 2011, over town months after Boles gave notice of his request for leave on May 10, 2011. (McDonald Dep. Exs. E & N).

34. Disputed.  It is Wal-Mart policy to issue the "Notice of Deisgnation" within five (5) days of the request for leave. However, there is no testimony or evidence that Wal-Mart actually provides this notice within five days of the leave request.  In Boles case, the Notice of Designation was not generated until August 18, 2011, twenty (20) days after Boles' second set of leave paperwork was submitted on July 28, 2011 and nearly three months after it was first submitted on May 24, 2011. (Quawad Dep. Exs. H, K, L and O).

35. No dispute.

36. No dispute.

37. No dispute.

38. No dispute.

39.  No dispute.

40.  Disputed.  It is a blatant and outright lie for Defendant
     to claim that Plaintiff did not submit leave paperwork until
     July 27, 2011.  Wal-Mart's own file contains a Certification
     of Health Care Provider from Dr. Gail Mautner dated May 20,
     2011 and the fax cover sheet from Dr. Mautner's office
     indicates that it was faxed to the market office on May 24,
     2011. (Quawad Dep. Ex. H). Quawad McDonald acknowledged in his
     deposition that Boles submitted leave paperwork to the market
     office in May 2011.

         Q. Do you recall Mr. Boles eventually filling out leave of
         absence paperwork and submitting medical certification in
         support of his leave in May of 2011.

         A. At a point in time, yes, only after once again not
         reporting to work. (Quawad Dep. 103:21-104:1).

41.  Disputed.  Boles testified that he was in contact with the
     market office regularly in May 2011 when he was initially
     submitting his leave paperwork. (Boles Dep.

42.  Disputed.  Boles clearly provided the required paperwork.
     (Quawad Dep. Ex. H)  He understood his leave was approved and
     it was only when his pay was cut off in mid-July that he
     learned there was a problem. (Boles Cert. ¶2)  At that point
     he again obtained the necessary paperwork and medical
     certification to support his leave.  (Quawad Dep. Exs. K & L).

43. Disputed.  Brown testified that the paperwork would have
    been sufficient to support the generation of a Notice of
    Eligibility, but that the certification would have to be
    signed by the doctor before Wal-Mart could issue a Notice of
    Designation. (Brown Dep. 33:9-25).  Defendant's
    characterization of Dr. Mautner's certification as "vague" is
    false.  Dr. Mautner's certification clearly states that Boles
    was suffering from a "large, painful ulceration on the lower
    extremities" and she clearly indicated the length of time she
    expected that he would be absent from work. (Quawad Dep. Ex.
    H)

44. No dispute that Wal-Mart retroactively approved FMLA leave
    from May 9, 2011 through July 31, 2011.  Defendant's
    allegation that Boles paperwork was two months late is false.
    (Quawad Dep. Ex. H).

45. This statement is a legal conclusion.

46. Disputed.  Plaintiff applied for medical leave in July,
    2011 and Dr. mautner submitted a medical certification stating
    that he needed leave through November 2011.  (McDonald Dep.
    Exs. K & I, Brown Dep. 39:9-15) and on August 11, 2011 Wal-
    Mart HRSS granted FMLA leave and personal leave through
    September 29, 2011. (Quawad Dep. Ex. M).

47. There is no evidence that Boles submitted any leave
    paperwork in August 2011.  The evidence clearly shows that

Boles' last request for leave was submitted at the end of July 2011. (Quawad Dep Exs. K & L).

48. Disputed. Boles submitted a medical certification documenting his need for leave through November 2011 and Wal-Mart understood that Boles was requesting leave through November 2011 (Quawad Dep Exs. K & L). Moreover, Defendant completely mischaracterizes the document that it cites. There is nothing on the document cited by Defendants that contains any certification that Plaintiff understood "that this was unprotected job leave, which meant that his failure to return to work and/or keep Walmart apprised of his medical condition could result in the termination of his employment." (Weisbrot Cert. Ex. U).

49. Disputed. Boles leave was not extended yet again as a courtesy. Boles submitted medical certification in support of leave through November 2011. (Quawad Dep Exs. K & L). Leave was granted in accordance with Wal-Mart's 90-day salary continuance policy. (Brown Dep. 39:16-24).

50. Disputed. Wal-Mart was not unaware and investigating Boles' whereabouts. It knew he was on leave as his doctor had certified his need for leave through November 2011. (McDonald Dep. Exs. K & L, Brown Dep. 39:9-11). Moreover, Quawad McDonald conceded that he received text messages from Boles. (McDonald Dep. 176:3-178:20). Those texts clearly indicated

that Boles had not been cleared to return to work by his

doctor.  (McDonald Dep. Ex. T).  Moreover, the testimony cited

by Defendant contains a discussion of McDonald's understanding

regarding when Boles' leave was supposed to end.  There is <u>no</u>

discussion of any alleged investigation of Plaintiff's

whereabouts in McDonald Dep. 117:14 - 119:25)

51.  Disputed.  This statement is a blatant and outright lie.

Plaintiff had one leave of absence from May 9, 2011 through

October 24, 2011.  He submitted medical documentation

supporting his leave on three occasions on May 10, May 24th and

July 26th, 2011. (McDonald Dep. Exs. E, H & K).  Wal-Mart's

HRSS group which is responsible for the leave approval process

only approved Boles' leave once – on August 11, 2011.

(McDonald Dep. Ex. M.) There is <u>no</u> discussion of "numerous

phone calls" being made "in an effort to reach" Plaintiff in

McDonald's  Dep. at pages 117:14 - 119:25.

52.  Disputed. Per Plaintiff's responses to statements 50 and 51

above, Wal-Mart clearly knew where Boles was and why he was

not at work.

53.  Disputed.  The letter notifying Boles that his employment

had been terminated was dated and sent on October 27, 2011;

several days after Boles attempted to return to work.

(Weisbrot, Exhibit W).

54.  Disputed.  Boles gave Wal-Mart numerous documents in
     support of his request for medical leave.  It is implicit in
     Boles' request for leave that he wished to return to his
     employment when he recovered – that is the accommodation that
     he sought.  (McDonald Dep. Exs. E, H & K).

55.  Disputed.  Defendant is taking isolated statements in
     Plaintff's deposition completely out of context.

56.  Disputed.  Plaintiff clearly alleges in this action that
     his medical condition qualified as a disability under the
     NJLAD and that he was entitled to accommodation. (Boles Cert.

57.  Disputed.  To the extent that Dr. Mautner's deposition
     testimony is being taken out of context,  Dr. Mautner did make
     the statements cited.

58.  Disputed.  Boles' provided medical documentation in support
     of his condition to Wal-Mart on three separate occasions.
     (Wuawad Dep Exs. E, H & K).  Wal-Mart's corporate
     representative testified that it is not Wal-Mart's practice to
     seek additional information from employee's or their doctors
     beyond what is provided in the certifications.  (Brown Dep.
     45:24-46:10).

59.  Disputed.  Boles does not dispute that he sent text
     messages to McDonald after September 10, 2011.  There was no
     agreed-upon return to work date of September 10, 2011.  On
     August 11, 2011 Wal-Mart's HRSS approved Boles for leave

through September 29, 2011. (McDonald Dep. Ex. M) (Brown

Dep.).  Boles pay was suspended for several weeks in July

2011.  However, once Bole's pay was re-established, his pay

continued uninterrupted until his employment was terminated.

(Boles' Cert. Ex. A).

60.  Disputed.  On August 11, 2011 Wal-Mart's HRSS approved

Boles for leave through September 29, 2011. (McDonald Dep. Ex.

M)

61.  Disputed.  Plaintiff provided complete information

regarding his medical condition to Wal-Mart and his request

for leave was approved through September 29, 2011.  (McDonald

Dep. Ex. M).


Colin M. Page & Associates
Attorneys for Plaintiff


_____
Colin M. Page, Esq.

Dated:  January 15, 2014